Our next case is again State of Kansas v. SourceAmerica. Joining me on the panel this morning is Judge Thacker via video and Judge Traxler is on the phone. So I know that there's an appeal and a cross appeal in this case, and so we'll begin by hearing from Mr. Nolan. Thank you, Your Honor. Peter Nolan on behalf of Intervenor Appellant Cross Appellee, Kansas. It's the position of Kansas and the Secretary of Education that the Randolph-Shepard Act applies to the cafeteria solicitation at Fort Wiley precisely because the civilian contractor provides the cafeteria management, the supervision, and the food employees to operate the cafeteria alongside the Army. As was brought out in the arbitration, the Department of Defense always outsources some of the services for the operation of military cafeterias to civilian contractors. That's on page 103-2 of the record. The Department of Defense always operates the cafeterias alongside these contractors. Military personnel are generally precluded from performing many cafeteria operations concerning cleaning and sanitizing tasks required to prepare and serve safe and high-quality food to the troops. These cafeteria operations are denominated as dining facility attendance by the Department of Defense, and these cafeteria operations are always outsourced to a cafeteria contractor. Now, depending on the deployment of troops, the cafeteria contractor can also provide some or all of the cooks and employees preparing food. If the contractor provides even one position with the responsibility to peel potatoes, the Department of Defense has long recognized the contract as being subject to the Randolph-Shepard Act. Potato peeling is not good for troop morale, and historically it was assigned to the civilian contractor at Fort Wiley for that reason. Contractors operating a DFA contract alongside the Army are required by Fort Wiley to provide cafeteria management and supervisors who are specifically experienced in operating a cafeteria and employees who are required to be certified food handlers precisely because, as explained by the Department of Defense, a DFA contract is a military dining facility contract. That's also stated clearly on page 1032 of the record. Now, consistent with this guidance, and prior to the solicitation we're talking about, back in 2016 the Army recognized the priority of the Randolph-Shepard Act for the blind vendor at Fort Wiley who managed and supervised DFA operations with limited food preparation, if it was potato peeling, alongside the Army providing and managing every single cook. The facts at the hearing were unrefuted. There is no need for a contract to contain management over cooks for the contract to be subject to the RSA by both Fort Wiley and the Department of Defense. The facts of the arbitration were also that the solicitation for the DFA contract we're talking about specifically requires management, administration, and supervision of the operation of the cafeteria because all of the food services required by the solicitation pertained to the operation and management of the cafeterias. The solicitation itself, paragraph 3.1.1 said, the contractor shall hire and train staff for management, quality control, and sanitation at all dining facilities. That's a JA-464. The management, supervisory, and administrative requirements of the DFA contractor go on for pages. A chart which compared the cafeteria operations, including management, from the previous contract, which everybody agreed was an RSA contract, to the new contract shows that similar cafeteria management requirements continued from one contract to another. That's at JA-1249 through 1251. The evidence of the arbitration was that the DFA management and services were integral to and part of the operation of the cafeterias at Fort Wiley. In this instance, Congress gave the Secretary of Education an express delegation of authority to enforce the Randolph-Shepard Act concerning the operation of a cafeteria in the 1974 amendments to the RSA. Congress provided that any limitation of a blind vendor's operation of any vending facility, including a cafeteria, by a federal agency like the Army or the AbilityOne Commission, must be justified to the Secretary, and her determination is binding on them. Also, Congress provided that the Secretary has the duty to determine, on an individual basis, if a contract for the operation of a cafeteria should be awarded to a state licensing agency on behalf of the blind vendor. Yes? Nolan, is there any limiting principle to this proposition, no matter how far removed the work might be from the actual preparation of food? You could say, for example, the cafeteria operation hired an accountant or lawyer to assist in its preparation of necessary documents, taxes, that kind of thing. Is that also governed by this statute? It would have to be for the operation of the cafeteria. The strongest evidence that these are for the operation of the cafeteria is that the Department of Defense itself says that these are cafeteria contracts. They are military dining facility contracts. They don't call the accountants military dining facility contracts. Yes, it does have to be for the operation of some of the parts of the cafeteria, some of the services of the cafeteria, which are integral to the cafeteria. All the parties urge this court to follow the Supreme Court's opinion in the United States BP. In footnote 13, the Supreme Court cites to its nation's bank opinion to explain that a similar delegation of authority to enforce the banking laws that was given to the comptroller of the currency required the judiciary give Chevron deference to his deliberative conclusions. The Secretary of Education's deliberative conclusions concerning what constitutes the operation of a cafeteria deserve no less. As the Supreme Court stated in me, at the very least, considerable wage accorded to an executive department's construction of a statutory scheme, it is entrusted to administer under Skidmore. This court, I looked at it, back in 2000, held Congress has left it up to the Department of Education, not the Department of Defense, to interpret the Randolph-Shepard. Let's look at that interpretation of that letter that was sent out by the Secretary of Education. In it, she determined the Randolph-Shepard Act applies to both types of contracts. She was talking about full food service and DFA. She determined that the Randolph-Shepard Act applies to the DFA contract like the one we have here. We know that because her letter cites... It is in the court's record. It's not in the record from the arbitration. Why should we consider that at all? Because her opinion gives the opinion of the Department of Education as to whether the Randolph-Shepard Act applies to DFA contracts. What should have happened, Your Honor, is that either the Army or AbilityOne should have gone to the Secretary of Education at the very beginning and said, look, we know we have a blind manager who's operating this contract. We're going to take away potato peeling in the hopes that that makes this contract not subject to the Randolph-Shepard Act. We know that under the Randolph-Shepard Act, you have to bless this scheme on our part. They didn't do that. You are correct. She didn't have the opportunity to step in at the time that the act calls for her to step in. But the fact that she has stepped in and she has given this opinion, still the court may consider that. It doesn't have to have been done prior to the action. Yes, Your Honor. What about the fact that the letter is really a private letter sent to a congressman in response to an inquiry? It's not really the kind of sort of formal adjudicatory or rulemaking process or advisory process that an agency typically follows. So does that impact how much weight, if any, to give to the letter? I don't think it does in this case. And the reason for that is, as I was just saying, this is the type of letter she would have written back to the Army or to the Ability to Want Commission had they followed the Randolph-Shepard Act and sought permission to eliminate an opportunity for a blind manager. The first part of the Randolph-Shepard Act, the very first section, does not contemplate a rulemaking. It says every agency who's going to eliminate an opportunity for a blind vendor must run that decision by, that scheme by, the Secretary of Education. And her decision is final and binding. It's not even subject to judicial review. So the Randolph-Shepard Act contemplates that the question will be asked and an answer like that given in this letter will be given. The letter cited this arbitration as part of her recent support for the opinions in her letter. So we know that her letter applies to this arbitration. In fact, the trial court admonished the Department of Justice lawyer that this letter is contrary to the representations you've made that the Secretary hasn't expressed an opinion about this arbitration. So in response to an order from the court to determine if the Secretary meant what she appears to have said about the applicability of the Randolph-Shepard Act to the DFA contract, at Fort Riley, Department of Justice counsel represented that general counsel for Department of Education had told him that the Department of Education does not affirm any individual panel's decision. And this lawyerly non-answer, though, does not give the district court cause to dictate to the Secretary of Education that the operation of the dining facilities at Fort Riley are not subject to the Randolph-Shepard Act where she has issued a well-reasoned interpretive letter similar to what she would have done had these agencies sought her approval and Congress has not ruled out her interpretation. I say that that interpretive letter is well-reasoned because, in many parts, it comports with all the parties are saying and what the cases say. The letter interprets the term operation to mean the vendor must manage or direct the workings of the cafeteria. Everybody agrees on that. The disagreement arises from the Department of Education's position that nothing in the Randolph-Shepard Act requires a vendor to manage every aspect of the cafeteria. As we talked about previously, the Department of Defense does not require every aspect be managed, clearly on page 1032 of the record. Fort Riley itself did not require that every aspect be managed when the previous contract was run by a blind vendor and the Army was managing all of the cooks. And her interpretation is also supported by the case cited by the Army, the United States v. Best Foods case. They cite that for the proposition that the operation requires management functions necessary to control the facility, sort of like what the Secretary says.  may jointly operate a facility along a subsidiary company, like the blind vendor, in a joint operation where both entities manage functions necessary to control the facility. And as the Secretary stated, where a vendor is responsible for all of the functions of the cafeteria, aside from those performed by the military, and those functions that the vendor would do as supervisory, administration, sanitation related functions, the vendor can be said to manage the cafeteria, even if the vendor is not preparing the food. That is exactly the joint venture described in Best Foods. Mr. Nolan, you've got about 30 seconds left, but before I turn it over to your colleague, I did want to ask you a question about your standing argument. You didn't say anything about it here this morning. To be perfectly frank, I was a little bit perturbed because your brief would suggest that, first of all, in response to the waiver issue, you indicated to the court that you had preserved this statutory standing argument below. And in fact, I've looked at this record, and it appears that it was the government who pursued the statutory standing argument in the district court, and you seem to have suggested to us that you had preserved it in your brief, and I didn't see anything in the record that suggested that, so I'd like you to respond to that. I believe the government... I'll have to go back and look at the timeline, but I believe they even raised the standing before we even got into the case. And it was afterwards that we got into the case, and we joined in the standing argument. And, Your Honor, can I look for that site while they're arguing and give you the specific site to support that rather than taking the time right now? Certainly. Certainly. Thank you. All right. Mr. Holman. Yes, Your Honor. I believe the Department of Justice is going to go first. Do I have the right order? Okay, go ahead. Ms. Myron, go ahead. Thank you. May it please the Court, Laura Myron for the government. I'd like to start with the question of whether the dining facility attendant contract here is within the Randolph-Sheppard Act. In 2012, the Army, and since then, the Army has been updating the way that it does these contracts. So in 2015, when the previous contract expired, the Army decided that it would use a dining facility attendant contract that includes only janitorial and custodial services, and that is plainly not within the meaning of the Randolph-Sheppard Act, which contemplates priority for the operation of vending facilities. That accords with, as we've noted in our brief, the Supreme Court's definition of the term operation and operate in best foods, which requires some degree of management or directing the workings of the facility. And as the district court recognized, not just some degree of management somewhere, but management or directing the overall operation of the facility. That also comports with the other uses of the term in the statute where Congress contemplated that the operation of such a facility would be with food of a comparable quality at a reasonable cost. It also contemplated that such operation would not be indirect. Yes, Your Honor. I'm sorry, I'm losing my voice. Can you hear me now? Sorry. Yes. We're still technically challenged, at least I am technologically challenged when it comes to this newfangled way of making arguments. So it seems to me that at least that the term is subject to multiple interpretations of just how far the scope of an operation needs to be to qualify under the contract. And isn't it true that at least with respect to this contract that it contemplated, for example, the hiring of a project manager with an advanced degree, including experience in managing cafeteria style or multi-entree operations and also a quality control manager with proven performance. The contract seems to suggest by itself a level of operation that if not on all fours with the wide parameters of what you traditionally might believe to be an operation of a dining hall at least has some aspects of management and operation. And so wouldn't it be reasonable then for the Secretary to have concluded and others to have concluded that in fact this contract falls within the RSA? No, Your Honor, because the test that we are proposing and that the district court adopted does not contemplate some managerial aspects over the contractor's own employees. It contemplates managerial responsibilities, administrative responsibilities with regard to the facility as a whole. And if you look at in comparison to what's called a full food services contract where the vendor would be doing the payment, the head count, the menu planning, all of those kinds of things, that's the kind of management directing the working of the facility that the statute contemplates and that the district court recognized is necessary for something to be within the Randolph-Shepard Act. But if I could, I think perhaps your question is touching a bit on the letter that was previously discussed and I'd like to also take an opportunity to talk about that. And as we've explained in our brief, it's not the kind of agency decision to which a court normally, a court's deference under various doctrines such as Chevron. But even if you assume that some level of deference is due, the letter simply cannot support the interpretation that Kansas is proposing before this court. It says that the vendor must, and this is on page 2261 and 62 of the JA, must manage or direct the working of the cafeteria. It says that some contracts may be limited to discrete tasks so as not to entail overall operation of the cafeteria. And that is exactly the kind of contract that you have here before you today. It is not overall operation of the cafeteria. It is discrete custodial and janitorial tasks that the vendor is performing and the Army contract is performing the vast majority of the administrative, supervisory, and food preparation services that the cafeteria is providing. Even if you were to think that some measure of deference is due, which as we've explained for various reasons in our brief, just simply is not true, the letter does not support the test that Kansas has proposed which imports a qualifier like pertain to, relate to, integral to, into the statute where it simply does not appear. And if I might take a few minutes to talk about the RSA review requirement as well, which is the issue on which we have appealed. I'd like to note that the district court's understanding of that provision is also overly broad. It would bring into the Secretary of Education's purview a decision which my friend on the other side has noted is binding on the federal agency for the question of how the Army can set up its cafeteria and whether or not it can use its own soldiers in operation of the facility or not. I think as a factual matter I'd like to note that when this decision before you was made in 2015 when the Army was taking a look at its previous contract and seeking to bid out a new contract, that decision is starting from scratch. Kansas is contending that they have some entitlement or right under the statute or the contract to continue on as the vendor in question and that simply isn't the case. The question is when the Army starts fresh in 2015 and says we'd like to use our returning soldiers in the facility here and we'd like to support them with a dining facility attendant services contract for custodial and janitorial services, whether that decision is to be made by the Secretary of Education. And that simply isn't the kind of arbitrary and harmful limitation that Congress was intending for the Secretary of Education to police in enacting the review requirement provision and it just cannot be the case that the Secretary of Education is the appropriate decision maker for whether the Army can use its own soldiers in operation of the dining facility at Fort Riley. I mean the statute, Ms. Myron, I'm sorry,  to suggest that the Secretary of Education should be sort of the ideal person to gauge whether or not a particular action falls within or without the statute. And I understand the prerogatives of the Department of Defense, but there's no exclusion here from the scope of the statute for DOD. In fact, this is, I would think, principally what this statute was intended to cover, these contracts that fall on military basis. So why isn't the District Court's interpretation here reasonable in that it's the Department of Education who has the ability and authority and right to interpret the statute? With regard to the review requirement, Your Honor? Yes, right. So I disagree that the statute is capacious enough and that Congress intended for the Secretary of Education to be the decision maker here. And if you look at the provision in context, what it does is says that the Secretary of Education shall provide regulations that are designed to assure, where feasible, the placement or operation of such facilities in military property, excuse me, on federal property. And then it says that any limitation or operation of a vending facility based on a finding that such placement would adversely affect, etc., etc., the Secretary shall be consulted with regard to those decisions. And that's not the kind of decision that you have here. There is no limitation on the placement or operation of the facility. What you have is a decision where the Army is looking at how it intends to employ its own soldiers in its own facility and is starting from scratch in making a determination that it'd like to follow the Army-operated model. And that just isn't a limitation, a kind of arbitrary and harmful limitation on the placement of the facility or the operation of the facility that Congress intended to provide the Secretary of Education with review over. It simply does not contemplate that any downstream, any decision with downstream impact or narrowing of a contracting opportunity would be something that the Secretary of Education would weigh in on. Our interpretation also accords with how the Eighth Circuit has understood the decision where it's looking to provisions where agencies said, sure, you can operate this vending facility, but we're going to charge you a commission on any sales or we're going to require you to place it next to a competing facility or we're going to limit the hours or the things that you can sell. And that certainly isn't comparable to the kind of decision that you have in this case where the Army is selecting how it's between two models and placing its soldiers in its own facilities. And it simply is, as the district court recognized, puzzling to conclude that Congress intended that decision to be made by the Secretary of Education. And if I could, just one additional thing on the contract, the previous contract with regard to the record, my friend on the other side has suggested that Kansas previously operated the DFA contract and I would note and I believe we've noted in our brief that that contract was begun in 2011 as a full food services contract, which we do not contend is not subject to the RSA and there's no dispute that that would be subject to the RSA. And there was a renegotiation with regard to the returning soldiers returning to operations in the dining facility and the Army agreed to let Kansas continue out the remainder of the contract on the dining facility attendant services. It's not fair to suggest that a similar contract was previously entered into with Kansas that contains the same services under the Randolph-Shepard Act. The circumstances at issue there are different than what you have here where we're starting from scratch with a contract that is only custodial and janitorial services that are limited in nature and ancillary to the operation of a dining facility. I see I'm out of time. Thank you. Thank you very much. Mr. Nolan. Your Honor. Your Honor, are you skipping somebody? You know, I'm having a bad day today. Go ahead, Mr. Holman. Yes, thank you, Your Honor. I appreciate that. I'll try to be a little bit briefer. I want to focus. I represent Source America and Lakeview Center, Inc., both of which are nonprofit agencies. Source America is what's known as a central nonprofit agency in the U.S. AbilityOne program, and Lakeview Center, Inc. is a nonprofit agency in the AbilityOne program. Both are nonprofits that operate to create jobs for the significantly disabled, and they operate very extensively in connection with the Javits-Wagner O'Day Act, which we haven't talked much about here today but is really quite central to this case. And I'll come back to that in a minute, but there is another entire U.S. federal agency involved in this matter, the U.S. AbilityOne Commission that is created by the Javits-Wagner O'Day Act, looked at these services, added these dining facility attendant services to the U.S. AbilityOne procurement list by notice and comment rulemaking, a process that Mr. Nolan elected not to proceed in or participate in. This work was added to the U.S. AbilityOne Commission. So we have effectively a federal agency who, by notice and comment rulemaking, has answered the question that these are dining facility attendant services that belong on the AbilityOne procurement list. We have a second federal agency, the Department of the Army, who has looked at these services and has determined that these services belong on the U.S. AbilityOne procurement list. I note in this regard that Mr. Nolan mentioned NISH, which was his court's decision in an earlier version. What he didn't tell the court, he told the court that the court in NISH said to defer to the Department of Education. That's not quite right. Let me read the final paragraph of NISH. Insofar as the contracting officer's decision conforms with the various governmental authorities that have previously considered the issue, the reasonableness of her decision is strongly indicated. While the fact of consistency standing alone may not warrant affirmation of her judgment, our independent analysis confirms that her application of the R.S. Act was both permissible and correct. Indeed, the U.S. Army, in that case, this, the Fourth Circuit, deferred to the contracting officer as to whether the work or dining facility attended the services or full food services. As related to the Department of Education, I told Ms. Myron I was going to leave this to her and talk mostly about standing, but I have to take one pass at Secretary DeVos's letter because the process by which Secretary DeVos's letter came into this case is deeply troubling. There was live litigation regarding this matter. Somebody went to the Secretary of Education through the United States Congress and got her to give a private letter on a live piece of litigation that nobody contacted the Department of Justice about, nobody contacted me about, and then they showed up nine and a half months into this litigation with a letter that didn't come out by notice and comment rulemaking, wasn't vetted, we don't know what the Secretary was told, we don't know what the exchanges were with the Congressman, all we know is that somebody went to the Secretary of Education without telling the Department of Justice, without telling me, despite this matter was in litigation and Mr. Nolan and his client knew about it, and got a private letter from the Secretary, which the Department of Justice then quite clearly in response to Judge Ellis' direction, because Judge Ellis did not take this lightly, Judge Ellis sent the Department of Justice back to the Department of Education to ask whether this was their opinion, and the answer was an unequivocal no. So there is no Secretary DeVos opinion about this case, and this letter that Mr. Nolan keeps relying on has no place in this case and is not something to which this court can defer. Indeed, to the extent that it were such an opinion, the court would have run straight into epic. The U.S. Supreme Court's recent decision which says there's no deference to the Secretary of an agency where they act in a way that interferes with the action of another agency. And here the U.S. Ability One Commission has already said by notice and comment rulemaking that this DFA work is on the Ability One Commission. There would be no deference. Sorry, Judge, yes? It's okay, Mr. Nolan. When you say that the Secretary interfered with the operation of the Jacob Wofford Act, but she has authority to interpret the RSA, and that's well within her kin. So I don't know that it's fair to say that she's interfering. Now, you may complain, and you've indicated that you're troubled, by the way, in which she became involved in the case, but she clearly has the authority to talk about and interpret the RSA, right? Let me answer that in two steps. One, Your Honor, the Secretary's authority on the Randolph-Shepard Act ends at the edge of the Randolph-Shepard Act. What the Supreme Court made very clear recently in EPIC is that if the Secretary's opinion were to stray beyond that and to say the Javits-Wagner-O'Day Act or impact something that another agency has done, no, she wouldn't have authority to do that. Absolutely she wouldn't. But I don't think the Secretary did this anyways because at the end of the day, the Secretary wrote a letter back to a congressman. Who knows what happened in those conversations? And the Department of Justice has said unequivocally it is not the position of the Secretary in this case or otherwise. There is no position of the Secretary on this issue. And any reference, continued reference, by Mr. Nolan that there is after the Department of Justice has said there is not is just not fair. But I want to turn very quickly, if I can, Judge. I know I don't have too much time. I want to make sure that I clear up a few misrepresentations in Mr. Nolan's reply brief because they're important to the standing issue. One, Your Honor, has already noticed unequivocally, Kansas, in response to our argument on waiver based on Your Honor's decision, Del Webb, that this is statutory standing and can be waived. Unequivocally, on page two of your brief, Kansas states, Kansas argued to the District Court that Appellee's lack standing did not fall within the zone of interest protected by the RSA. It then cites, as Your Honor has noted, the U.S. government's brief. Kansas did not argue this, and as it sounds like Your Honor has already done, if you go to the docket 69-1, which is not in the joint appendix, and search it, you're not going to find these arguments in Kansas' brief because they didn't make them. With that said, Your Honor, I also want to point to this third, another aspect of this argument that they didn't make below, specifically as related to this adequate remedy of law argument. That also is not, not only is it not in Kansas' brief, that was never argued to the District Court. The only adequate remedy of law issue that was argued to the District Court was argued by the Department of Justice as related to the U.S. Court of Federal Claims. There was never an argument made about what is contained in our complaint. But what Kansas has represented in its reply brief about our complaint is flat false. Let me be clear. There are six different defendants in our complaint. The United States Department of Education, the Department of the Army, the Department of Defense, and the secretaries of each of these agencies. And Mr. Nolan has represented, Kansas Council has represented this court that only count seven of our brief runs to the Department of the Army. But if you read our complaint, you're going to see that count seven isn't actually a count against the Department of Defense related to whether the Department of Defense had to amend the Defense Federal Acquisition Regulation. The remaining six counts quite clearly run to all defendants. Indeed, time after time again in our complaint, unnoted by Mr. Nolan, we state quite clearly that the action is brought against the United States. And those paragraphs are cited some in our brief and also appear at paragraph 118 of our complaint, 128 of our complaint, 146 of our complaint, 153 of our complaint, 161 of our complaint, stating consequently, any reliance by the Army on that decision and the Army's failure to award Lakeview the Fort Riley contract are also arbitrary, capricious, and contrary to law. That appears in connection with every count of our complaint. And the last thing I want to say to the court that I think is important because it's not argued in Kansas' brief is that the lower court ruled in our favor on two counts. What we've been talking about here today primarily is count three. We have not talked about count four that the court also ruled in favor of Source America and Lakeview. And the reason we haven't talked about it is because Kansas didn't argue it in its brief. That is a 555B argument that the lower court addressed across three pages of its decision finding in favor of Source America and Lakeview. Indeed, the finding is very central to some of the things Mr. Nolan said because he repeatedly argued about what happened at the arbitration. Well, what happened at the arbitration is we tried to intervene three separate times into the arbitration. Twice by letter and once in person. Mr. Nolan opposed those. We were never able to intervene into the arbitration. So when Mr. Nolan talks about the evidence being entered it was being entered in a forum where we were not present. Indeed, Brigadier General Carey who wrote the dissenting decision in that declared expressly that the arbitration process that Mr. Nolan keeps referring to was fundamentally unfair. He recommended that it be vacated as unfair and he dissented vehemently not just on the substantive issues but on the way that the arbitrators conducted the hearing including by repeatedly excluding witnesses and not allowing participation of my clients. The 555B argument is unchallenged by Mr. Nolan in his briefs and stands. With that, I see that my red light is on. Thank you for your time today. Before I allow some rebuttal this is not a question it's more of a statement that I was thinking about as I was hearing you all make your points and that it seems a bit ironic that these statutes both the JWAT and the RSA which I think Congress clearly intended to be to work I don't think they intended for these statutes to work at cross purposes but intended for them to maximize opportunities for historically disadvantaged groups which Congress has instead turned into this turf battle between the varying agencies as to the scope of who has the authority and in which regime and how far the authority reaches in terms of interpretation and the like which I find troubling because that's not what the energies of the federal government should be spent on but anyway if I were king for a day I might change that but I'm not just a free judge. Would it be possible for me to offer one comment to that? Sure. There has been this issue your honor is correct in this issue has been addressed by Congress Congress at one point directed the parties to go back the Department of Education the Department of Defense to go in the U.S. Ability I Commission to go back and meet they actually went and they crafted a joint policy statement that the DFA work would belong to Ability I the full food service operation of cafeterias the RSA unfortunately one side has never abided by that line drawing and any time the DFA work is desired it is taken through this arbitration process. All right, thank you. Mr. Nolan we've got some time for rebuttal. Go ahead. Before my rebuttal can I respond to that? Sure. As we point out in our briefing that joint policy statement was specifically withdrawn from the Army I'm sorry by the Secretary of Education I think back in 2015 or so saying that it does not represent  but that's in our briefing. Go ahead, Mr. Nolan. Your Honor, I think I see what the problem is. We did plead to the District Court in our briefing response to the motion for summary judgment that defendants did not violate the APA by preventing Source America and Lakeview from participating in the arbitration proceeding because they lack standing to intervene in an RSA arbitration. That was in our brief. That's not in the record and I don't know why. What we did was we cited to the Army's brief which had very similar language but I can furnish that to the Court. It is part of the District Court's record and should be part of your record but it's not there. With your permission I can send that in so you can see that we absolutely did raise standing at the District Court. All right. We can make a motion. We'll consider that. Go ahead and finish your rebuttal. The next thing I wanted to address was this idea that we weren't operating alongside the military. The Department of Defense directive which I referred you to later says that the Department of Defense also maintains responsibility to plan menus, obtain food, some of the things which counsel for the Army was pointing out that we weren't doing. I refer you back to the chart which was introduced at the arbitration. There are all of the tasks on there and only three of the 19 tasks were not continued from the RSA contract to the non-RSA contract. Also, I want to pick up on one thing that counsel for the Army said. She said they admit that when an agency is limiting the things that you can sell that that's an appropriate time for the Secretary of Education to step in to approve or not approve that. That's exactly what happened in this case. You had a contract as everybody agrees which had been modified to take out Army cooks back in 2011 or 12. Then when this new contract came up what the Army did was they said we're going to limit the services provided by the contractor. We're going to take out potato peeler. That's what they said would allow them to deny the Randolph Shepherds priority to the remaining services. They take out potato peeler. That's exactly the type of thing which the Army on page 40 of their brief said should be reviewed by the Secretary of Education. As you know the 1974 amendments were passed because the military was singularly insensitive to expanding the program. These provisions which I cited to you earlier where the Secretary of Education must individually look at certain things individually look at schemes by agencies such as Ability One or the Army to get rid of the blind people or individually remove services from a contract like potato peeler. They gave her that authority because of the singular insensitivity. Congress particularly gave the authority. I have a question. If we don't consider or give any deference to the letter from the Secretary of Education do you still win your appeal? I assume you would think you do. I do and that's because of the best foods case which says that operate means you operate alongside of and that's exactly what's being done here. The Department of Defense has characterized this as operate alongside of and Kansas has characterized this as operate alongside of. The evidence at the hearing if you look at that chart and you look at what's required the evidence at the hearing was that they were operating alongside of and finally because the Department of Defense labels this a cafeteria contract. Then what I was going to say about one more thing at the hearing and I keep coming back to the hearing because the facts really matter. At the hearing I asked the contract specialists why did you remove potato peeling from the contract? Remember as we said all the cooks had already been removed before they were gone and the Army recognized that the vendor could operate the contract pursuant to the Randolph Shepard priority. Why did you remove the what they said was food prep was removed from the current contract so that the Randolph Shepard act priority would not apply. That needed to be run by the Secretary of Education and it wasn't. Very briefly on the standing argument as I was getting to before the basic standing argument is you have this letter that hasn't gone through certain procedures and we're saying that was brought on by the AbilityOne Commission and the Army themselves. The federal agencies that should have run this by the Secretary of Education. Source America pleads that it is the facilitator for the AbilityOne Commission and helps companies get these orders that are placed on the procurement list but they should not have standing just because AbilityOne and the Army violated the act by not seeking this type of letter from the Secretary of Education about their activities. Thank you. Ran out of time on your rebuttal. Ms. Myron, you saved some time. Do you want to be heard any further? I don't know that I have time for rebuttal but I would just make a quick point or two with the Court's indulgence. With regard to the review requirement, what we're talking about is a decision where the Army is making after the expiration of a previous contract in which it's asking how it's going to set up its facility and it's determining that it's going to follow a model where the Army does all of the food preparation, all of the supervisory administrative responsibilities and a contractor provides some janitorial and custodial services. It simply isn't the case that that's the kind of decision that this statute contemplates the Secretary of Education would have the final authority to make. As we've noted in our brief, that comports with the Eighth Circuit's decision and various others. As the District Court recognizes, it would be puzzling for this Court to conclude that the Secretary of Education has a role in telling the Army where it can and cannot use its soldiers and what services it can and cannot choose to, where it cannot choose to employ its soldiers. Thank you. If there are no further questions. Thank you very much. Thank you. Yes, sir. Can I address just that point since I was sort of in addition to the time that they had been allotted before? I can do it in 60 seconds. Very briefly. This is not a case where the Secretary of Education is telling the Army what to do about Army cooks and the like. It really is down to the potato peeler. I'm probably the only person here who's peeled potatoes at the facilities at Fort Riley back in the 70s. It is not a position of honor. It's usually given to people who haven't done exactly what they're supposed to. What the Army did was... What did you do to attain that high honor? I forget your honor was allotted. That's the question I have too. I'm sure it was well earned. But the Army was willing to sacrifice the morale of its troops by having them do potato peeling to get rid of the blind vendor. This is not the Secretary of Education telling the Army what it does with its troops. Historically, potato peelers were done by civilians because of that morale issue. That's what this is about. Thank you very much. Counsel, thank you for your arguments in this case. We would typically come down from the bench and greet you personally. Obviously, we cannot do that here today, but we appreciate nonetheless the opportunity to be part of the important work of our court and appreciate the important role that you play in allowing us to do our work. On behalf of the court and my colleagues, thank you very much. We'll take a short recess and move on to our final case. Thank you. The Honorable Court will take a brief recess.
judges: Albert Diaz, Stephanie D. Thacker, William B. Traxler Jr.